Our next case is No. 23-1778, United Services Automobile Association v. PNC Bank. Again, Mr. Fleming. Good morning again. May it please the Court, Mark Fleming with Greg Lantier still on behalf of PNC Bank. This judgment is infirm for a whole host of reasons. I'm happy to address any of them. But to be clear, the points made in the last appeal about Section 101 apply just as well here. I don't plan to revisit that in detail unless the Court has questions. But these claims are directed to abstract ideas, and the remaining elements, both individually and as an ordered combination, are just routine photography instructions and conventional data processing steps performed by a conventional... As you argued in terms of improvement over the prior art, et cetera, the MRDC patents essentially the same as your argument we just heard? Yes, the argument as to all the patents. I can talk about auto capture if you'd like, but the general principle is exactly the same. Talk about auto capture. I beg your pardon? Talk about auto capture. Very well, Your Honor. Happy to. So the abstract idea here is simply verifying the image of a check before sending it on to be processed. It is exactly the same as what this Court said in Hawk v. Castle Retail. The processing of digital images is at most abstract data manipulation. And comparing a digital image to a monitoring criterion or an alignment guide is merely analyzing two sets of data. And then capturing the image once it passes the criterion is just, again, the functional result of the comparison. And even that is stated at a very high level of abstraction. The claims don't recite any way of programming or designing software. There's no algorithm. There's nothing that they purportedly discovered. There's no technological improvement that makes the devices better. It's simply gathering, displaying, and analyzing information, just like in trading technologies or in Alice itself, for that matter. You know, there's some reference in the district court's opinions to histograms. The spec specifically says a histogram is a well-known graph. That's page 243 of the appendix, column 9, line 28. There's no disclosure of how to create one, let alone an innovative one. And this notion that we heard from Mr. J in the earlier appeal, that a human eye can't tell if the image is good enough and you need a computer for that, well, that is just a classic benefit inherent in automation. Computers do all kinds of things better or faster or more accurately than human beings do. But these claims don't improve the computer itself. They just use existing capabilities and characteristics in the specific environment of check deposit. And reciting specific monitoring criteria, like adequate light brightness or adequate positioning, doesn't change that. Again, those are recited just as results. And there's nothing in the claim that teaches us how the computer tells if an image is good enough. So unless the court has further questions on this, we think this is all the court needs to decide. If these claims are ineligible, you don't need to decide any of the other issues in this case. However, there's a few that I would address with the court's indulgence. I think for auto capture, the stated improvement over the prior art is that the computer itself takes the picture when it decides that it is it is an inadequate positioning and with sufficient light to touch the picture of the computer automatically, hence auto capture, decides when to take the picture as opposed to having the user. The well, it could be either. It could be either the bank computer tells the device, take the picture now, or it could be that there's software on the device that says, take the picture now. And then the picture automatically is taken as opposed to having the user press the little. If you take your camera and you put it in the check, there's something that tells you to do that. So so the software tells you. So yes, so we so we have designed around this. We don't use this feature anymore. So I'm just trying to understand. No, I'm not. And the best way for me to explain it is in contrast. So what the prior what our app now does, which is why we we're not accused of infringing this anymore, is when the when the software determines that the check image is in a state to be taken, then you, the user, have to press a little button on your phone. Right. The little image of the button on your phone that says take a picture. You press the picture that is correct. What the auto capture patent recites is that instead of making you press the button, the phone will automatically itself take the check and take a picture of the check and say, OK, we're ready to go now. You don't have to press the button. That is the asserted advance over the prior art. It's such a minor little thing. When the prior didn't exist, the phones weren't being used in prior art, were phones being used to make deposits? Well, I'm sorry. I mean, so in terms of what was actually being done in the market or what was known to a person of skill in the art, because in terms of what was known by 2009, the iPhone was out. I mean, everyone knew you could use a phone to take a picture. Right. The iPhone came out in 2009. It seemed to me that what the patents was drawn to were the problems that a consumer has when a consumer uses the phone to make the deposit. It gets straight and doesn't get straight. The light's wrong. So there is nothing in the claim that recites anything technical about how to solve that problem, even assuming that that is a problem. I'm happy to assume that arguendo. I'm still trying in my analysis to get by what the improvement over the art is and what the abstract idea is. Yeah. So the abstract idea is this is all directed to verifying that the image is adequate. Who knows what adequate means? It's not stated in the claims, but adequate for processing before the picture is taken, as opposed to taking the picture, sending it off and then having someone say, oh, no, this isn't good enough. You check the adequacy before you take the picture. But that is just to make it easier to talk about this in context. Can you give us the auto capture claims that we're talking about where they are? Sure. Look at them. Yes. Happy to do that. So this is the 571 patent page 249 of the appendix 249. It's also in the addendum to our blue brief, if that's easier. And then the independent claims here are claim one and claim nine. And claim one says the standard introductory non-transitory computer readable medium comprising instructions for depositing a check. Again, that's what we're directed to here. Depositing a check that, when executed, costs the processor two. Monitor an image of the check in the field of view of a camera of a mobile device with respect to a monitoring criterion using an image monitoring and capture module of the mobile device. Then capture the image of the check with the camera when the image of the check passes the monitoring criterion and provide the image of the check from the camera to a depository via a communication pathway between the mobile device and the depository. Nothing here makes a mobile device... What about claims 12 and 13? Yeah. The monitoring criterion comprises light contrast or light brightness and then 13 is skewing or warping. Nothing in those claims, or for that matter in the spec, says how the computer readable medium evaluates light contrast, light brightness, skew or warping. Doesn't say against what standard it's monitored and certainly does not suggest there's anything innovative from a technical point of view that the phone couldn't do before. This it's simply using the ability of the phone to... That's your step two argument? Yes, in some ways. That's what it is. It overlaps... That's not whether it's abstract. No, it does. And this Court has said sometimes the considerations will overlap a little bit. And that's because you're looking at what is it exactly? Are they purporting to improve the phone? The image monitoring and capture modules are 112F or 1126 limitation, right? It is. The Court found that. And so all of the structure that's in the spec gets imported into the claim? This was construed by the District Court to mean image capture and monitoring module 456 and equivalents. And the spec talks about the problems of skewing and focus and all of that. Well, it doesn't provide any structure. And this is a separate problem we have in this in this appeal, right? There's no actual structure disclosed for the image monitoring and capture module. It simply restates the function itself. You claim that in your... Yeah, that's a different point. ...if we agree that the claims are not indefinite. That is true. You do not need to worry about any of that. And then we pick up the so-called structure of the spec. And the structure is some type of a device for dealing with an algorithm in dealing with the problem of focus, of light, of misdirection, right? There is, so there's no structure cited that actually goes even to the level Your Honor has just stated. All it says is there is an image monitoring and capture module 456. The District Court construed that as a camera and related software. There's nothing more than that. On claims 12 and 13, if instead of monitoring criteria, it would told you specifically if it approaches this range of light contrast or this range of brightness and had actual parameters for all those things. And the same thing for this viewing and warping. Would that have been sufficient to make it eligible if they put in, essentially, I know we throw this word around, but I'm going to throw it around again. An algorithm of these are the criteria you have to meet before you automatically take the picture. So I think that would still be just claiming the results, right? It's like putting parameters into a claim as happened. That's starting to sound a little bit like McGrow to me. No, because in McGrow, there was a new way of actually figuring out how to animate this stuff that wasn't being done by human animators. This, on the other hand, if you were to redraft the claim, there's a new way of figuring out when a picture of a check is going to be sufficient to use for this processing purpose so that it automatically takes it. Because that's just unless there were some disclosure or explanation as to what the device is doing that it couldn't do before that was supposedly being improved. Merely reciting, use your device to accomplish this result, to check for this data. Remember, the image is just data, right? And so all you're asking the phone to do is look at the data and see if it matches a particular level. That is just obtaining and comparing one set of data. You never argued that this was done by cameras conventionally. Cameras like the old Nikon camera? No, but we never argued check. I mean, we don't have to argue, first of all, that check deposit. You did not argue that cameras have long done what this discloses doing. We certainly have argued that consumer mobile devices have done what this is claiming to do, which is receiving, processing and comparing data. We certainly argued that. And the abstract idea here, I mean, even their own articulation devices in the check deposit. Not in check deposit art specifically. We're not talking about mobile devices automatically taking pictures, right? Well, a mobile device automatically taking a picture is not something that they claim to have invented. A mobile device taking a picture by itself when a certain condition has been met is something mobile devices can always do. And again, the proof of that is they don't disclose any way of doing it. They don't have any kind of technical innovation that says, you know, previously, phones required the user to press a button. Now we don't have to do that. That was what I was trying to get at with my hypothetical is if it had more specific criterion here for when it would do it. It does seem to be different than just a user using, putting it over and taking a picture of the camera. This is taking the user essentially out of the equation for determining when the picture is going to be sufficient. Because it just, I mean, a lot of us who use these devices, I don't think it's disqualifying for me to suggest that I've used these. You hold the phone over it and it's pretty, it is in a way a very good idea whether it makes it eligible or not, it's a different story. But you don't have to retake the photo ever. Under the older versions, and apparently your new version, you might have to retake the photo if by the time you push the button when it said it was OK, it's not OK again. This one, it only will snap it if it's OK. And that OK must depend on specific criterion. The question is if this is claimed anywhere in the patent or the specification. It seems to me that if it's actually claimed, then that really does bring it closer to the crow. I think in order for that to be eligible, the patentee would have to have explained what it invented that made it possible for a phone to take a picture automatically, as opposed to having the user do it. That's not something they have invented. They don't claim to have invented that. There's nothing in the specification that says they invented that. All they're doing is taking that pre-existing capability and applying it to the context of taking a photograph of a check once it matches a particular result. And that is not, all that's doing is taking the abstract idea and applying it in a narrowed circumstance, which has never been enough. Because there is nothing, and one can look through this spec, it's, you know, it's a different spec from the one I was talking about in the previous appeal. But it is written at just as high a level of generality. There's nothing there at all suggesting that they invented anything technical that suddenly made it possible for a phone to take a picture automatically. That was a pre-existing capability that they have not. 779 is also an auto capture patent. It is, Your Honor. It is. It is one of the ones that was not tried. Same arguments. Well, yes, you're trying to appeal. Yes, absolutely. Yes. Same arguments. Absolutely. Yes. I, there are alternative arguments on these patents. Reversal on any one of them requires a new trial on everything because of how the verdict form was structured. So I'm happy to talk about any of the other issues. I'm also happy to answer any questions the court has. Otherwise, I'll just sort of balance it like that. We're out of time. We'll give you two minutes for rebuttal. Thank you, Your Honor. Mr. Jay. Thank you, Your Honor. I'll start with one just very minor point about the 779 question that you just asked. Even if you reach the 779 patent, what Mr. Fleming just said is not right because it was not tried. That would not be a basis for reversing the judgment. So a small point, but an important one. So if I can... You're going to argue that out. Pardon? You're going to argue that out in the district court. That's what we're going to order you to do, okay? Understood. So if I can, I'll start with the auto capture patent. But I certainly want to talk about the MRDC patents as well. So I think that, as Judge Hughes pointed out, the dependent claims give some specificity about what the monitoring criteria are. There's more specificity on that in columns three and four of the specification. And that passage, which begins at appendix 240 and column three, the last full paragraph from columns three to four, this all explains what this is getting at. This is not the abstract idea of having the phone take a picture when the user would otherwise have pushed the button. This is about generating a compliant image that will accomplish check deposit without, depending on the user's judgment or the user's fumble fingers. So prior art phones could take the pictures, right? Prior art phones could take pictures, yes. Prior art phones were not being used to make deposits. Prior art phones were not being used to make deposits, right? This is, you know, we're still in the 2000s. So basically the problem is that if you just allow a human being, if you just said to the human being, here, use your camera and take a picture of check and deposit, the customer can make a bunch of mistakes. That's exactly right. And that accords with the experience of uploading photos for deposit as opposed to taking mobile photos and submitting them. Capturing the image is difficult. That's what it says in column one. Capturing an image is difficult. But capturing a compliant image requires judgments that a human can't make because the technical questions that go to a digital picture of a check are different than the technical. Because the human won't know whether there's enough light on the check in various places. The human won't know if it's out of line a little bit. Those are the simplest and they get more complicated from there. But yes, that's right. And as a result, so. But it doesn't tell you how to do that automatically. Well, it tells you to implement these monitoring criteria. And the reason why the individual monitoring criteria aren't, you know, such as, you know, this many lumens of light is not set out in the claims is because part of this innovation, as with the MRDC patents that we discussed before, is that the bank sets the criteria. So in other words, it's not that the inventor is saying that this is the ideal lighting level. The inventor is saying this is an invention that can be used by any bank that sets criteria for digital images of checks for deposit. All of these are geared to accomplishing deposit of the check. And then when you have an auto-captured image, you reduce the amount of processing that is necessary because you don't have to check a bad image for errors if you never took the bad image. Right. Just as you never took the bad. So when we were discussing the prior patents, we compared taking taking a digital image that is having the having the software check it before it is submitted to the bank for deposit. Right. That avoids the problem of the bank having to deal with a bunch of images taken by an unsophisticated customer. Why isn't that what 571 is doing? So this is this is one level beyond that. Right. Because it doesn't because it's working in real time to ensure that the image is not captured until the conditions are right. It doesn't have to analyze an image file for compliance. It's analyzing using the camera in real time. It triggers the camera. And that means you take one picture and you don't have to do the same amount of checking for errors on that picture. Whereas as we've talked about in the context of these other other claims, the software checks for errors in the in the user taken picture because we're using consumer equipment. It may be prone to errors and you want to tell the user that you can't submit this. It's not it's not compliant. The auto capture patents take that take that to the next level and don't even capture the patent. And as it says at the end of the passage that I was pointing to. So this is in column four. We're still on page 240 of the appendix line 17 by ensuring that the image of the check passes in monitoring criteria during pre image capture monitoring. The number of nonconforming images of checks is reduced during presentment of the images to a financial institution for processing and clearing. And that literally is what makes it possible to do this at scale. The not having to deal with a flood of noncompliant images that you have to send back to the to the customer and say we can't deposit this. The MRDC patents are one way of getting it getting it. This is a further innovation beyond that. There's auto capture invention. So basically when you point your camera at the check, if you haven't done it exactly right, if you're doing it in such a way that some of the bank's criteria are not being met, the picture isn't taken. And instead instructions come up to tell you how to do it. Well, yes, that's similar to if you go to the theater. Now, you don't get a program anymore. You have to go to take a picture of the code of the square code. Well, the jiggles. But the problem is that when you get it all wrong, they don't instruct you how to fix it. So the problem of taking a picture of something that doesn't line up right is not so I share the gripe about QR codes. I'm not sure I share the premise that that's analogous here. And of course, I mean, let me just different thing is that when you try to take a picture of the QR code and didn't get it right, it doesn't work. Software doesn't come up and tell you how to correct that problem. That's right. So this software, not only can it tell you how to correct the problem. So, for example, if the room is too dark and it cannot take it, cannot take the picture, it can tell you that. But also it ought to like suppose that you are that the issue we're dealing with is skew. Right. You have to get it at the at the right angle so that the text can be read correctly and it's not going to be distorted. So if you're holding a phone, I'm sorry, how is what you're doing here improving the functionality of the camera? The camera knows what to do. Right. If you get it straightened up correctly, it's improving the suitability of the camera to take bank deposit compliant images and improves the overall usability of the network as the method of depositing the check. I wouldn't say that. Why not? Technically, it's especially it improves the claim is to verifying the depositability of the check of an image of a check. That may seem like a nitpick, but I think it's an important one because what we're talking about is that if you say all we're trying to do here is we're trying to improve the depositability of the check. Right. But again, it's of an image of a check taken with consumer equipment. And I think that's important because we're solving a technical challenge that only arises when you use that consumer equipment. Right. So this is not a challenge that bank tellers have to deal with. It arises when we're using the abstract idea. The problem arises when we're using the abstract idea. Well, if the abstract idea were check deposit, that would be that would be the case. But the abstract idea here is not check deposit. The claims here, the claimed advance is not directed to check deposit. The claimed advance is to taking accurate pictures that pass the technical criteria that only apply to this type of image. It's an image file and not a two-dimensional scan. The claimed advance is making sure that the device you're claiming for starters, that's on the user, that it works. I mean, at a very high level of generality, there's some truth to that. But not just that it works, but that it works in a way that a bank can implement at scale. Right. I mean, the consumer agrees with that in the beginning when they sign the contract to use the software. Indeed. But the thing I pointed you to in column four makes the scale point. And I think that that's true of each of these inventions, but particularly with the auto capture point that it's not just that you can take more, that you can do more deposits. It is. It takes less processing, less processing power in order to evaluate the images for the suitability that on the criteria that are set by the banks along the along the. That sort of sounds an awful lot like a lot of cases we've projected where we've said using computers for what they are designed for, which is to make things faster, efficient, more accurate in ways that humans can't do that are still ineligible. No, I don't think so. I think this is the distinction that the court drew in Solutran. Right. In Solutran, obviously, the court found the claims they are ineligible. But what the contrast it drew is improving the technical capture of information. This is improving the technical capture of information. The capture is not being done in this way. So the advance is allowing the use of a consumer device to be used to capture these types of images, a different kind of image than a scanner would generate, and to have it be used at scale in a bank deposit system. We're not just talking about taking a picture more rapidly. We're talking about the characteristics that the picture must have in order to resolve a technical challenge that is unique to the use of this technology. Scanners don't pose this technology. Scanners take a two-dimensional image up front, and they don't have to worry about ambient lighting or skew. That, I think, is what these are solving for. Unless the court has any other questions about any of the other issues, I know Mr. Fleming's argument was devoted to 101, and so is mine. Okay. Thank you. Thank you, Your Honor. Mr. Fleming, two minutes again. Three points, if I may. And I thank the court for its attention today. I know there's a lot here. And, of course, if you reverse on 101 in both of these cases, you don't need to address anything else. The disclosure in the 571 about auto capture is found at column 4, which is on page 240. And beginning at line 27, it says, In an implementation, the image capture may be performed automatically by the camera, the mobile device, and or the financial institution, as soon as the image of the check is determined to pass the monitoring criteria. Alternatively, the user may manually instruct the camera to perform the image capture. That's it. There's something, again, a little further on in column 10, which just says, Column 10, line 27, the image may be captured either automatically or manually. There's nothing in there about how to do it. How do you address his point that the whole point of this is that, you know, they don't have to claim the specific criteria because they want to, they're claiming the idea of using criteria, which are, and they, there's some specificity on the different types of criteria. They just don't set the actual parameters. And the reason is that they want the banks to have the flexibility to determine that criteria themselves. Some banks may need more detail. Some banks may need less. Why is it the fact that they don't specifically claim only one set of criteria detrimental to it being eligible? That's not, that doesn't exhaust our argument. That's one part of it. But even taking that, that is, the claims do not say how to program the device to say that the image meets the criteria. The reason they don't say it, and the reason the specification doesn't disclose anything about it, is because the skilled artisan knew that these devices were doing it already. The mobile devices knew how to monitor lighting. They didn't create monitoring lighting of a picture. They didn't create monitoring of skew by a mobile device. It was already out there. All they're doing is using these existing capabilities to do something in the narrow specific area of check deposit. And even if you think it was innovative, even if you think it was brilliant, that might get them a business award. It might get them an advantage in the market or the Nobel Prize. It doesn't get them a patent. We would respectfully submit in both of these cases that the judgment should be reversed and all claims held patent ineligible. Okay. Thank you. Thank both counsel. The case is submitted.